## PARISH *v.* WHEELER.

A railroad corporation mortgaged its engines, cars, &c., &c., " and all other personal property in any way belonging or appertaining to the railroad of said company." Under this description, canal boats, purchased with the funds of the corporation, and used and run by it in connection with the railroad, but beyond its terminus, are not included.

Though the corporation exceeded its legal powers in the purchase of such boats, it cannot, nor can one claiming under it, set up such violation of duty to defeat the title of a mortgagee.

Nor can the corporation defend itself against a claim for money, paid at its request to one who advanced the price of a steamboat purchased for it, on the ground that the purchase was *ultra vires;* although the plaintiff, when he paid the money, knew all the facts.

*E converso*, the plaintiff, having sold the steamboat under his mortgage, cannot excuse himself from crediting the proceeds on the ground that the transaction which furnished the consideration of the mortgage was *ultra vires* on the part of the corporation.

In an action by the mortgagee of chattels, after forfeiture, against the mortgagor, or a party having his rights, for the chattels, the purchaser is not entitled to recover their full value, but is limited to the amount of the debt.

APPEAL from the Supreme Court.   Action to recover the value of fourteen canal barges, of which the plaintiff claimed to be the owner, and which, he alleged, the defendant had converted to his own use.   Upon the trial before a referee, these facts appeared: In 1845, the Northern Railroad Company was incorporated, to construct, maintain and operate a railroad from Ogdensburgh to Lake Champlain. (Laws of 1845, chap. 324,

p. 351.) The terminus on the lake is at Rouse's Point. By the fourth section of its act of incorporation, the company was subjected to all the conditions and restrictions imposed upon the Attica and Buffalo Railroad Company, a corporation created by chapter 242, Laws of 1836, page 319. The fifteenth section of the latter act declares that the said corporation shall possess the general powers and be subject to the general liabilities and restrictions prescribed by such parts of the eighteenth chapter of the first part of the Revised Statutes as were not then repealed. In 1852, and prior to April, 1853, one James F. Church became the purchaser in his own name of the fourteen barges in question, and had them registered in his name, and used and employed them up to August 30, 1854, in a transportation line from Rouse's Point to the city of New York, known as "Church's Ogdensburgh Railroad Line." The money for the payment of these boats was furnished to Church by the railroad company, with directions to purchase the barges in his own name; and at the time of such purchase, and during all the time Church ran and used the barges, he was the station agent of the railroad company and in its employ, and it received the profits and defrayed the losses of the transportation line. Prior to March, 1852, one Edwin C. French, who was the station agent of the railroad company at Ogdensburgh, and a British subject, purchased the British steamer Boston, at Quebec, and gave a mortgage upon her, to secure his drafts for the amount of the purchase money, payable at different times, and drawn by him on the corporation, accepted by it, and indorsed by Hiram Horton, one of its directors. The conveyance of the steamer was made to French. She was registered and enrolled in his name as owner in the Canada offices, and French made and delivered to the corporation a declaration that he held the property in trust for it. The corporation was to have all the profits from running the steamboat, and was to sustain all the losses incident thereto. On the 15th December, 1851, the corporation executed a mortgage to secure its bonds, issued and about to be issued, to the defendant and two other persons, as trustees, which were known as the second issue of bonds. The

mortgage granted and conveyed all the real and personal property then owned or thereafter to be acquired. The corporation, on the 7th of April, 1854, made another mortgage to the trustees mentioned in the mortgage of December 15, 1851, reciting that, since the execution thereof, the company had acquired other lands and personal estate than such as was held and owned by it at the time of such conveyance, and the said company, in order that all the real and personal estate in the first mentioned mortgage and in the present indenture mentioned might be more fully vested in the trustees, thereby granted and conveyed to them "all and singular the railway, rails, bridges, fences, privileges, rights and real estate, buildings and fixtures, of every kind and description, now owned by said company, or which shall hereafter be owned by them, and all the tolls, incomes, issues and profits to be had from the same, and all the land used and occupied for railway depots or stations, with all the buildings standing or hereafter to be erected thereon, and all real estate now owned or hereafter to be acquired by the said company, together with all the locomotives, engines and tenders, passenger cars and freight cars and all other cars, and shops, tools and machinery, and all other personal property whatsoever of every name and nature, now owned or hereafter to be acquired by the said company, and in any way belonging or appertaining to the said railroad of said company, now constructed or hereafter to be constructed." In August, 1854, the company, wishing to obtain a loan of money to retire the last draft drawn by French in payment of the steamboat Boston, applied to the plaintiff for a loan of money for that purpose, amounting to near the sum of $6,000. The plaintiff had just recovered a judgment against the company for near the sum of $9,000, and had an unsettled claim against it amounting to over $3,000 which had been submitted to a Mr. Parrott for arbitrament and adjustment. An agreement was entered into between the plaintiff and the company, dated August 4, 1854, which recited the recovery of said judgment, and that the parties had agreed to compromise and settle the same for the sum of $8,736.61, with interest from May 24, 1854, and that

Parish v. Wheeler.

the sum was to be paid on or before the 1st of June then next; reciting, also, that the plaintiff had lent to the company the sum of $5,396.86 for the purpose of retiring said draft, and for the purpose of making the final payment on the purchase of said steamboat by French; reciting, also, the claims of the plaintiff against the company then in the process of adjustment by Parrott, and that, for the purpose of securing the payment of said sums, with interest, the company agreed to procure and induce French to convey to one Dickinson the said steamboat Boston, and also to procure from Church a conveyance of the fourteen canal boats. It was further provided that said sums were to be paid on the 1st of June then next, and that if, in the meantime, any debt should become due by the plaintiff to the company, it might, at his election, be deducted from the sums due to him. The plaintiff agreed, after the conveyance of said steamer should have been made and perfected to Dickinson, to procure from him a charter party to Lee, the president of the company, until the 1st of June then next, for the sum of $1,500, to be paid on the 15th of May then next: the charterer was to insure the steamer in the sum of $10,000, in the name and for the use of Dickinson. The plaintiff further agreed that, after the canal boats should have been conveyed to him, he would give a charter party to said Lee for the same until the 1st of June then next, for the sum of $1,000, payable on or before the 15th of May then next— the charterer to pay on demand the premium for insuring the same in the sum of $5,000. And the company covenanted and agreed with the plaintiff that the said steamer and canal boats were, and should be, at the time of the conveyance thereof as aforesaid, free, clear and discharged of and from all incumbrances, liens, penalties and forfeitures, and should so remain and continue until the execution of the said charter. If the sums due to the plaintiff were paid on or before the 1st of June then next, he agreed to procure a conveyance from Dickinson of the steamer, and would himself convey the canal boats to such persons as the company should appoint. And it was further agreed that, if the moneys due to the plaintiff were not

paid in full by the 1st day of June then next, it might be lawful for said Dickinson to sell said steamer, and for the plaintiff to sell said canal boats, or so much or so many of them as might be necessary to pay him all moneys due to him thereon; and any surplus of money remaining, or any of said property not sold, should be returned to said company or its appointee. On the 30th of August, 1854, French conveyed the steamer to Dickinson, and Church conveyed the canal boats to the plaintiff. The company, having failed to pay the interest due upon its bonds on the 1st day of October, 1854, on the 6th of that month made and executed to the then trustees, Eldridge, Wheeler and Howe, a surrender, transfer and conveyance "of all the property, estate, rights and privileges, lands, tenements and franchises conveyed in mortgage to them, as trustees, by said two indentures of mortgage." This surrender was accepted by the trustees, Eldridge and Howe, on the same day: when it was accepted by the defendant Wheeler did not appear.

The referee, in addition to those stated, found the following facts: Before such acceptance, and before the trustees took possession of the boats or assumed to control them, but after they had taken possession of the railroad, Mr. Lee, the president of the company, informed Eldridge, who was then the managing trustee, of the charter party executed by Parish to him, and told him that he had no objections to the trustees running the boats, provided they would assume all the liabilities and responsibilities imposed upon Lee by the charter party; that, otherwise, he should surrender the boats to the plaintiff. This was agreed to by Eldridge, and the boats were subsequently run by Church under the direction of the trustees.

Mr. Hoyle, formerly a superintendent of the railroad, was the agent of the trustees. He and Eldridge were both directors of the railroad company, and both were aware of the agreement with the plaintiff of the 4th of August, and the conveyance of the boats to him; but it did not appear that they knew of the charter party executed to Mr. Lee, individually, until apprised thereof by him. Hoyle, when informed of the arrangement with Eldridge above mentioned, made no objection.

There was no claim made by the trustees, at the time of the surrender or previously, to the property in question. Some six months after the surrender, the defendant informed Mr. Lee, the president of the railroad company, that the language of the mortgage of the 7th April was dictated by him, or interlined by him, so as to embrace the property. After the deed of surrender, the trustees claimed the boats under the mortgage and deed aforesaid: they were run by Church under their direction; and, through Hoyle their agent, they forbid their delivery by Church to the plaintiff. On the 23d of October, 1855, a demand was made by the plaintiff of the defendant for the boats, which was refused, upon the alleged ground that the boats were in possession of the trustees, and that the defendant, as one of them, had no authority to make the delivery. The cash value of the boats, on the day of this demand, was $600 each.

The steamboat Boston was conveyed to Davenport Dickinson, in September, 1854, in pursuance of the agreement of the 4th of August above mentioned. She was a British bottom: it was necessary that she should be registered as owned by a British subject; and, for this reason, the conveyance was to Dickinson instead of the plaintiff. The steamer was subsequently run, as previously, in connection with the railroad line, under a charter party to Mr. Lee, as provided in the agreement of August 4th above mentioned.

At the time of the conveyance of the Boston, the plaintiff paid to Horton the amount of the last draft given to the builders as aforesaid, with interest and fees of protest—Horton having paid the same as indorser. The steamboat was then formally delivered by Horton, as the agent of French, to Dickinson, by going on board publicly, and in presence of the captain making such delivery with the keys, &c., of the entire vessel. Parish, the plaintiff, was apprised of the history of the steamboat prior to August, 1854: he was also informed that French, who was a British subject, had purchased the boat and held the title, and that French and Horton were liable for a part of the purchase money. Shortly after the deed of surrender, the steamer

was run in connection with the railroad line, as formerly, under the direction of the trustees. After the charter party expired, in June, 1855, Dickinson, with the assent of the plaintiff, attempted to get possession of the steamer, with a view to a sale in accordance with the agreement of the 4th of August: this was refused by the trustees and those who acted under them. The boat was followed to Canada by the agent of Dickinson, and there replevied by the latter and advertised for sale at Prescott, in Canada, on the 23d October, 1855. An arrangement was then made with the captain of the boat that she should be delivered at Prescott, after the delivery of her cargo: the steamer, however, ran into Ogdensburgh, and the captain and station agent of the trustees refused to surrender. possession. She was then sold, on the 23d October, 1855 (while lying at the wharf in Ogdensburgh), at Prescott, one and a half miles distant, but in sight, to one Crane, as the highest bidder, for $11,500. Afterwards an arrangement was made between the trustees and the plaintiff, through the counsel of the former, that Parish should take possession of the boat on his own responsibility as a trespasser, should the title of the steamer be established in the trustees. The crew refused to leave or surrender the vessel unless their wages were paid, for which they had a claim on the boat, and threatened violence if any attempt should be made to take the steamer away from them without such payment. The agent of Dickinson to procure possession was compelled to pay such wages, amounting, exclusive of the wages of the captain, to $1,043.35. About $388.56 was also paid for legal expenses, traveling charges and expenses of removing the boat and guarding the same, in the procuring possession and sale thereof, and $100 was paid to Dickinson to induce him to execute the papers necessary to vest the title in the purchaser at auction as aforesaid—making an aggregate of $1,522.41. The trustees caused the mortgage of the 7th of April aforesaid to be foreclosed: a decree was obtained, and in pursuance thereof the referee advertised for sale a claim against the plaintiff for taking and converting the steamer, her apparel and furniture, arising out of the proceedings aforesaid.

The referee also found that the account between the plaintiff and the railroad company was only settled up to the 1st of June, 1855, of the matters mentioned in the said agreement of the 4th August; that the balance due from Parish for the use of cars for filling in a certain tract in the said agreement referred to was $2,611.61, and the amount due from the company to the plaintiff under the said agreement was $12,642.83, after deducting all payments by means of the drafts and notes above stated and all other payments, but exclusive of the said sum of $2,611.61, which was not deducted or applied on the debt due from the company to the plaintiff. One of the items to the credit of the plaintiff, upon that settlement, was the sum of $5,396.86, advanced to the company to enable the final payment to be made upon the purchase by French of the steamboat Boston, as set forth in the agreement. Another item was for the filling in between Patterson and Elizabeth streets, mentioned in the agreement, and which was embraced in the award of Parrott above mentioned.

The amount allowed on the settlement for the last item exceeded the award some $600, in consequence of the arbitrator assuming a wrong level in his computation of the quantity of earth filled in; and this error was corrected upon the settlement. The settlement was made in good faith, and the balance above mentioned, found in favor of the respective parties, was correct as between them.

The referee found, as conclusions of law, 1st. That the plaintiff was, at the time when, &c., as stated in said complaint, the owner of the boats, or barges, therein mentioned; 2d. That the defendant wrongfully converted said property, as in said complaint is also alleged; 3d. That the plaintiff's damages, by means of the premises, were $8,400; for which sum, with interest from the 23d of October, 1855, he ordered judgment.

Upon appeal, the judgment was reversed at general term in the fourth district, and a new trial was ordered. The plaintiff appealed to this court, stipulating for judgment absolute against

him if the judgment should be affirmed.   The cause was sub-
mitted on printed arguments.

*Myers & Westbrook,* for the appellant.

*William C. Brown,* for the respondent.

COMSTOCK, Ch. J.   The mortgage given by the company,
dated the 7th of April, 1854, to secure its issue of bonds, was
upon its real estate, railroad, bridges, ferries, &c., locomotives,
engines, cars, tenders, shops, tools and machinery, and " all
other personal property whatsoever in any way belonging or
appertaining to the said railroad of the said company."   The
inclination of my mind is, that the canal boats in question were
not included in this description.   The boats were used and run
in connection with the road, forming that connection at the
point where the road terminated.   They were, in a general
sense, accessory to the business of the road; but I very much
doubt whether they belonged or appertained to it, according to
any interpretation which we can place upon those terms.

Assuming this to be so, I think, nevertheless, that the trustees
to whom the mortgage was given may be looked upon as repre-
senting the rights of the railroad company for any purpose
material to this case.   In October, 1855, the company was in
default in respect to the interest due upon the bonds secured
by the mortgage, and they executed to the trustees a deed of
surrender of all the mortgaged property, whether real or per-
sonal.   This deed certainly conveyed nothing which the mort-
gage did not embrace; but, under it, the trustees, or mortga-
gees, took possession of and controlled these boats, and this
was done with the consent of the company through its presi-
dent.   After this arrangement, the boats were run by the agent,
Church, under the direction of the trustees, and they were held
and used in this manner at the time when it is alleged that the
defendant refused to deliver them up to the plaintiff.   These
facts are mentioned, not for the purpose of showing a title in
the trustees to this property under their mortgage, or under

the deed of surrender; but to show that the defendant, as a trustee, had a lawful possession under the railroad company, so as to be irresponsible to the plaintiff, provided the corporation itself would be irresponsible, if it had been in possession at the time of the demand, and had refused to deliver up the property. It is not material to determine the precise relations between the company and the trustees; it being enough if the latter had the property in their hands by the consent and under an authority derived from the company. They may be regarded as bailees without title, and so accountable for the use of the boats; or we may call them mere agents. In any aspect, so far as mere possession, or the duty of giving up that possession to the plaintiff, are concerned, they stood in the shoes of the company. We must, therefore, inquire into the relations between the plaintiff and the company, for the purpose of ascertaining whether the plaintiff had any title or interest at the time of the alleged conversion. He must recover upon his title if he can recover at all, because he never had an actual possession, and because he only complains that the defendant refused to deliver the possession to him.

Proceeding then to that inquiry, the plaintiff had a security upon these boats in the nature of a mortgage. They were conveyed to him on the 30th August, 1854, by Church, on the procurement of the company, and pursuant to a previous agreement between the plaintiff and the company, dated the 4th of August, 1854, by which he agreed to reconvey to them or their appointee, on payment of the sums and liabilities which the agreement specified. It needs no argument to prove that this arrangement constituted a mere mortgage, and that the interest of the plaintiff would cease when his claims were satisfied. Much has been said on both sides about the supposed illegality of the original purchase of these boats by the company, through and in the name of its agent Church. It has been urged that the purchase was beyond the powers of the company; that the transaction was consequently illegal, and that the illegality is not cured by using the name of an individual in the purchase, or by the intention that he should hold

the title; and it is also urged that as the corporation, for the reason suggested, could not possibly acquire the title, it could not convey or mortgage, or procure it to be conveyed or mortgaged, to the plaintiff. I take the view most favorable to the plaintiff on this question, and concede that the conveyance to him was effectual and is to be maintained according to the exact terms and conditions on which it was given. Nor have I the slightest doubt that this is the correct view. Much has been loosely and inconsiderately said about the incapacity of corporations to acquire property outside of the precise purposes specified in their charters. To all propositions of this nature the short answer is, that corporations sometimes do actually purchase and hold property under that condition. If a railroad company buys and pays for a horse or a boat, and the vendor delivers the chattel, the corporation will own it and can sell or mortgage it, although its charter cannot be pleaded in strict justification of the purchase. This is a conclusion of common sense and common honesty, which no legal subtlety or refinement can refute. It cannot be true that the vendor of a chattel, who sells and delivers it to a corporation and receives his pay for it, can allege that he has never sold it, on the mere ground that it was unlawful for the corporation to buy it. Nor can it be true that the title is lapsed or lost on any such ground. These boats, therefore, belonged either to the railroad company or to Church their agent, in whose name they were purchased; and it is not material to inquire which was the owner according to the forms of that transaction, because the transfer to the plaintiff was the act of both of them.

Assuming, then, that the plaintiff, in August, 1854, took a valid security upon the boats in the nature of a mortgage, the material inquiry is, whether his claims, secured by the transfer, were satisfied at the time of the alleged refusal to give up the property; or, if not satisfied, then whether the referee erred in awarding to the plaintiff damages in the sum of $8,400— that being the value of the boats at the time of the alleged conversion.

In pursuing this inquiry, it becomes necessary to notice the history of the steamboat Boston, which the plaintiff also held as security for the same demand in the manner presently to be mentioned. It appears that, in or before March, 1852, one French, a British subject, and the agent of the company at Ogdensburgh, purchased the British vessel Boston for the use of the company. He paid part of the purchase money, and for the balance drew his four drafts on the company, payable at different times, which were accepted by the company and indorsed by one Horton. The vessel, upon this purchase, was transferred to French, and was registered in his name. It was designed, however, for the service of the company on the river St. Lawrence and Lake Ontario, and it was used accordingly. The said drafts would all mature prior to July, 1854, and the company was bound to pay them according to its acceptances. They had reimbursed to French the money which he paid down on the purchase. The boat was, in fact, bought wholly for the benefit of the company, and French executed a declaration of trust in its favor accordingly.

In the agreement of August 4, 1854, between the plaintiff and the company, which has been mentioned in connection with the canal boats, it was further stipulated that the company would procure from French a conveyance of the steamboat Boston to one Dickinson, of Canada, to be held by the latter also as a security for the same liabilities specified in that agreement, and to be reconveyed on the payment thereof. The vessel being a British bottom, the plaintiff could not take the transfer directly to himself. The agreement, therefore, appointed Dickinson to take such transfer, and it was made to him accordingly in September, 1854. He was, however, a mere trustee of the plaintiff, having no interest in the transaction, which, like that concerning the canal boats, was designed simply to create a security to the plaintiff for the claims and liabilities which the agreement enumerated. That security, it will now be seen, covered both the canal boats and the steamer Boston.

Looking now at the state of the accounts, for the purpose of ascertaining the extent of the plaintiff's demands, if he had

any, at the time of the alleged conversion of the boats, there are only two items which I propose to notice. The defendant denies that the plaintiff should be credited with the sum of $5,396.86, advanced by him to pay the last of the drafts drawn for the original purchase money of the Boston, and which the company had accepted. This is one of the items specified in and intended to be secured by the said agreement of August 4, 1854, and the plaintiff made the advance on the faith of that agreement and of the transfer of the steamer and canal boats; and he made it at the time of the transfer in September following. In other words, it was a present advance secured by the mort· gage. This item of indebtedness the defendant proposes to reject, on the ground that the purchase of the steamer by the corporation was *ultra vires* and illegal; and he insists that the plaintiff, knowing all the facts, made this advance in pursuance and consummation of that purchase. That the plaintiff knew all the facts is undeniable, and the referee has, in substance, so found. It should be further stated, that Horton, the indorser of the draft in question, had taken it up, and that the plaintiff paid the money to him. I am clearly of opinion that the position of the defendant, in respect to this item of the account, cannot be maintained. Conceding that the company, being simply a railroad corporation, ought not, according to its charter, to purchase and own a steamboat, it nevertheless did purchase one in the name of another person, and it took the possession and had the use of the property. Save and except such questions as might arise under the navigation laws, the company became the owner of the boat, and its title was never questioned. The vendor never repudiated the sale on any ground; and I think it would be very absurd to say that the corporation itself, or the defendant standing in its situation, can repudiate the transaction the benefit of which was received in the manner stated. In my judgment, when a sale of a chattel, made to a corporation, is executed and complete in all things, except the performance of its own promise to pay the price, a plea that it ought not to have made the purchase is not to be entertained, especially so long as it retains, and insists upon

retaining, all the benefit of the contract. In this case, the chattel was not only delivered and used by the purchaser, but the vendor received all his pay for it, so that reclamation on his part, upon any ground, was out of his power. The draft now in question represented the unpaid balance of the purchase money. It was paid by Horton, who had indorsed it for the accommodation of the company. It would be strange if the company could not lawfully protect and reimburse their own indorser, and equally strange if, after requesting the plaintiff to make the payment for them, they can be allowed to deny that they are indebted to him on that account. If the purchase of the steamboat involved any breach of the public law, the corporation alone was guilty, because all the restraints of the statute or the common law, affecting the transaction, are imposed upon it alone. There is certainly no moral turpitude if a railroad corporation buys a steamboat or builds a church; nor is there any legal turpitude. It may be an excess of power, or a private breach of trust in respect to its stockholders. The latter may complain, or the State may interpose; but corporations themselves, like individuals, in dealing with other parties, must live up to the rules of common honesty. My opinion is, that the referee properly allowed the advance which has been here considered, although my reasons for this conclusion are not precisely those which appear to have influenced him.

The other item which I propose to consider belongs on the debtor side of the plaintiff's accounts. The claims and liabilities mentioned in the agreement of August 4, 1854, were all to be satisfied by the 1st day of June, 1855. The same agreement provided that, on the transfer of the steamboat to Dickinson and of the canal boats to the plaintiff, charter parties should be executed back to Lee, the president of the railroad company, to last until the said day of payment should arrive; and that, if the demands were paid according to the agreement, the steamboat was to be reconveyed by Dickinson and the canal boats by the plaintiff to such person or persons as the company should direct. In default of payment on the day specified, the property was authorized to be sold at public auction. The

company made default, and the steamboat was sold at auction, pursuant to the power thus given, on the 23d of October, 1855, for the sum of $11,500. This sum, the plaintiff insists, is not to be allowed in payment or reduction of his claims under the security in question, assigning the alleged illegality of the agreement of August 4, 1854, as the only reason for this pretension. The learned referee appears to have sustained this position. In his opinion, which is before us, he assumes that the agreement was illegal; that the parties thereto, being the corporation and the plaintiff, were in *pari delicto;* and he then observes, that the law will aid neither party. In this branch of the case he considered that the defendant was the actor in seeking to enforce the application of the moneys raised at the sale, and that the plaintiff being in possession of the fund, the maxim, *"potior est conditio defendentis,"* applied. I incline to think, with the Supreme Court, that this reasoning, if it has any just foundation, is fatal to the plaintiff's entire case. The supposed illegal agreement of August 4, 1854, and the transfers of the steamer and canal boats, made in pursuance thereof, are parts of one transaction, and, together, they constituted the mortgage which is the plaintiff's only title to the property in controversy. If the contract, therefore, was illegal, in such a sense that the plaintiff, having sold a part of the mortgaged property, is not accountable for the proceeds, the same illegality, I apprehend, will prevent the enforcement of the contract in his favor as to another part of the same property.

But I am constrained to reject all the arguments on both sides of this case founded on the alleged illegality of any of the transactions involved. Contracts with corporations, made in excess of their powers, which are purely executory on both sides, and where no wrong will be done if the parties are left in their previous situation, I am willing to agree, should not be enforced, because such contracts contemplate an unauthorized diversion of corporate funds, and, therefore, a breach of private trust. But the executed dealings of corporations must be allowed to stand for and against both the parties, when the plainest rules of good faith so require. On another occasion,

I have said all that I desire to say on this general subject. (*Bissel* v. *The Michigan Southern R. R. Co.*, 22 N. Y., 262.) The most unfavorable statement of the particular matter now in question is, that the railroad corporation, in excess of the powers conferred by its charter, purchased and paid for a steamboat and several canal boats; that, being in the possession and use of the property in connection with its regular business, it mortgaged the same property to its creditor the plaintiff, taking back charter parties for a limited period, and also a stipulation for a reconveyance if the debt should be paid at the time agreed on; that the plaintiff, taking the usual course in such cases, caused a part of the property to be sold after a default had occurred, and received the proceeds of that sale, which nearly or quite satisfied the debt. In all this I can see nothing unlawful except the want of legal power or right to buy the property. But it was actually bought, paid for and delivered, and, therefore, became a part of the estate and assets of the company. The company could sell or pledge it to a creditor, and could redeem the pledge by paying the debt. In acquiring the ownership of such property, the corporation may have usurped a right not granted by its charter. But the acquisition was, nevertheless, a fact which no legal refinement can deny. It was a fact, too, having all the legal relations and incidents of any other fact of ownership. I think it will not be questioned that an execution creditor of the company could levy on this property and sell it for the satisfaction of his debt, and having thus obtained a satisfaction, I do not think that he could deny that he was paid, upon any theory of excess of corporate power, and levy again on other property. So, if the creditor, instead of proceeding to judgment and execution for his debt, takes a pledge or mortgage, and, by the exercise of the power of sale, obtains the cash for his demand, I do not see how he can raise the inquiry whether the corporation debtor violated the trust or duty which it owed to its shareholders in the purchase of the chattels pledged or mortgaged. So long as no one else questions the title thus acquired, and the property is made productive in the satisfaction of the debt, it would be strange

if the creditor can, upon such ground, claim that the debt still exists. And such is, in effect, this case. The security of the plaintiff, as I have said, was in the nature of a mortgage. The stipulation to reconvey on payment of his claims provided for nothing beyond the legal result of the transaction. The reconveyance, it is true, was to be made to the appointee of the corporation; but that clause, considered by itself, involved nothing illegal or even *ultra vires*. The plaintiff actually sold a part of the property for the payment of his debt, and he received the money. No one but himself questions, or can question, his right to make the security available in that manner. He does not pretend or suggest that he cannot hold the money thus obtained. On the contrary, he insists upon retaining it against all the world; but, at the same time, claims that his debt is neither paid nor reduced. Much has been said in the books (sometimes, I think, without reflection), about the powers of corporations and the consequences of exceeding those powers. But no authority can be found to justify the position of the plaintiff in respect to the matter here considered. I feel no hesitation in saying that the sum of $11,500, produced by the sale of the steamboat, pursuant to the power contained in the mortgage, must be applied toward the satisfaction of the plaintiff's demand.

It becomes unnecessary to examine further into the claims covered by the security. After charging the plaintiff with $11,500, the parties still differ upon the question whether those claims were satisfied at the time of the alleged conversion of the canal boats. It is conceded, however, that no such sum remained due as the referee awarded to the plaintiff, by way of damages for that conversion. The utmost that is claimed to be due, after allowing that sum, is a balance ranging from $1,000 to $3,000, and I incline to think, without a special examination, however, that the smallest of these sums is nearest to the truth. The plaintiff recovered $8,400, as the full value of the boats. This recovery, therefore, can only be sustained on the ground that if any sum, however small, was due, the legal measure of damages for the conversion of the pro-

Parish *v.* Wheeler.

perty mortgaged was necessarily the full value of that property. From the case, and the opinion of the learned referee, I am not able to say whether he proceeded on this ground or on the ground that the debt still due, after rejecting the credit of $11,500, exceeded the value of the boats, or whether his conclusion rested on both of these grounds. Allowing, as we do, that credit, the last mentioned ground becomes untenable; and it remains, therefore, only to inquire whether the other can be maintained.

It has already been observed that the defendant and his co-trustees were in possession of the boats either as mortgagees, or, if they were not included in the mortgage to them, then as bailees or agents of the company. Their possession was, at all events, a lawful one, because it had the full sanction and authority of the company. It must follow, that any defence to this suit, whether legal or equitable, whether a full or a partial one, which the company might have if they had converted the property, is available to the defendant. Could, then, entire damages, or, in other words, the full value of the property, be recovered against the railroad company? I think this question must be answered in the negative.

In the common law action of trover, the measure of damages, it is true, was usually the value of the property converted. If the suit was against a mere stranger, and parties other than the plaintiff had legal or equitable interests in the property, the sum recovered would be held by him upon a trust corresponding with those interests. A mortgagee, having the right of possession before forfeiture, and the absolute legal title afterwards, could sue in trover for the conversion of the chattel mortgaged, and, without regard to the amount of his debt, could recover the full value against a stranger guilty of such conversion. But the mortgagor, even after forfeiture, had an equitable right to redeem on payment of the debt. If, therefore, the mortgagee should, in such a case, recover the entire value in this form of action, the fund, after satisfying the debt, would belong in equity to the mortgagor, and could be recovered by suit in equity, or in the equitable action for money

had and received. And from this it necessarily results that, in trover by the mortgagee against the mortgagor, the damages should not exceed the amount of the debt. This is a conclusion which avoids a circuity of remedies. If, in the legal action of trover, the mortgagee recovers a sum, as the value of the property, beyond the amount due to him, on principles of equity he must refund to the mortgagor, if the equities of the latter have not been in any manner foreclosed or lost. But the law will attain the same result in a more direct manner, by adjusting the damages in the first instance according to the actual rights of the parties. This would be so if the law were administered according to the former system, under which the separation between legal and equitable rights and remedies was distinctly marked. It is more plainly so now, because, under the existing system of procedure, legal and equitable remedies are merged, and actions of the former class are subject to defences which belong to the latter. Thus, a mortgagee of chattels may, by action in the nature of trover, assert his legal right. But the mortgagor, or those claiming or holding under him, may also defensively assert their equitable rights.

Without examining other questions in this case, it results, from the facts and principles which have been stated, that the judgment entered upon the decision of the referee was erroneous, and that the Supreme Court were right in granting a new trial. This being our conclusion, the order must be affirmed, and judgment final must be rendered against the plaintiff, according to his stipulation, unless he elects to withdraw his appeal and pay the costs thereof.

DENIO, J., stated the following conclusions as the result of his examination of the case:

1. The canal boats were not embraced in the description of the property mortgaged to the defendant and the other trustees. The personal property mentioned was not all such as belonged to the company, but such as belonged or appertained to the railroad. The writer of the paper had enumerated locomotives, engines, tenders, cars, tools and machinery, and then, thinking

apparently that there might be other property of a similar kind which would not be embraced in this language, added, "all other personal property" "in any way belonging or appertaining to the railroad of said company." The canal boats did not belong or appertain to the railroad, though they were considered as belonging to the company. Their use in a transportation line between Rouse's Point and New York might be beneficial to the income of the road, and so would anything else which should facilitate traffic upon it; but that was not the kind of relation called for by the words used in the mortgage.

2. I consider the boats to have been in the possession of the railroad company at the time of the execution of the instrument of August 4, 1854; and that the company owned them so far as it was possible for it to own personal property which it had purchased and paid for, but which it was not authorized, under its charter, to use in any business which it could legitimately carry on. The builders or former owners had no title, for they had sold the boats and had been fully paid for them. Church had no title; for he had paid nothing towards them, but had acted throughout, in the purchase, as the servant or agent of the corporation. Moreover, he had put the company in possession of the boats, by employing them in the transportation line which was actually operated by the company. I am of opinion that the company could pass a title to property thus situated by a sale or mortgage thereof to a third person, which title would be good against the company and against any person claiming under it. They would be, themselves, estopped from setting up the infirmity of their title; and the defendant, claiming under the company, would likewise be estopped.

The same principle will establish the validity of the mortgage of the steamer Boston. As to that part of the case, I am of the opinion that it was quite lawful for the plaintiff to lend the company money to take up its acceptance, though the paper was given for the purchase of property which it had no right to use. The plaintiff is accountable for the proceeds of the

sale of the steamer, after deducting what he was obliged to pay in order to enable him to convey a good title.

3. It is made a question whether the mortgage to the plaintiff was not void, under the provisions of the statute. (1 R. S., p. 603, § 4.) The plaintiff was shown to be a stockholder; and if the company had refused the payment of any of its evidences of debt in specie or lawful money, within the meaning of the section referred to, it could not transfer to him any of its property for the payment of his debt. The mortgage of August 4, 1854, was such a transfer, though it was made as a security, and not in payment. The provision, in my opinion, embraces conditional transfers as well as absolute ones, where the object is to provide for the payment of the debt. But the mere suffering its acceptance to lie over, because it had not at the moment the means of payment, is not a suspension of specie payments within the meaning of the act. The words "refuse the payment of any of its notes," &c., mean something more than a mere neglect to pay by the day. The company, so far as it appears, had never intended to avoid the payment of this acceptance in specie, or its equivalent. It is not shown that payment had been demanded of the company. The very transaction which is challenged as illegal was entered into in order to raise money to pay the acceptance, and it was effectual for that purpose.

4. Nor was the mortgage forbidden by the latter part of that provision, which prohibits preferential conveyances in contemplation of the insolvency of the company; for it was not executed in contemplation of insolvency, within the meaning of that provision. The evidence no doubt shows that the company was greatly embarrassed; but the mortgage in question appears to me to have been given in the course of an honest endeavor to struggle along, in the expectation that it would eventually get through with its difficulties. It was not made in contemplation of insolvency, but in the hope of preventing insolvency. (*Curtis* v. *Leavitt,* 15 N. Y., 9, 110–142.)

5. If I am right thus far, the plaintiff had the title to the boats as mortgagee, and the defendant, by refusing to yield to

Parish *v.* Wheeler.

and recognize that title, was guilty of a conversion, unless the mortgage debt due the plaintiff had been otherwise paid before that time.    To determine that question, it becomes necessary to look at the contested items of the account.    The statement of the respondent's counsel, which I assume to be accurate, except in the instances to be presently mentioned, shows an over-payment by the company to the plaintiff of $79.03.    The award of Parrott, which is put down to the debit of the company at $2,089.13, cannot be increased on account of the mistake which is shown to have been made.    The plaintiff can only stand on his mortgage, which, in this respect, is limited to "the sum of or amount of the award of W. P. Parrott." But the plaintiff should not have been charged with the gross amount of the proceeds of the sale of the steamer Boston.    He was obliged to pay $1,522.41, more or less, in obtaining possession of the steamer; and this was a charge upon the fund, and should be taken out of the amount for which the steamer was sold.    This correction alone would leave nearly that amount due on the mortgage.    The defendant was not entitled to charge the plaintiff the sum claimed for the use of the cars.    By the terms of the mortgage agreement, claims of this nature were to be applied on the mortgage debt or not, at the option of the plaintiff.

6. The last question which I have thought it necessary to consider is, whether, assuming that the plaintiff was entitled to recover (as I think he was), he has not recovered too much.    The rule of damages which the referee applied was the value of the boats; and he reported in favor of a recovery for $9,023.86.    This was correct, if the defendant stood in the situation of a stranger; but if he held the possession under and by the authority of the railroad company, who were the plaintiff's mortgagors, then, inasmuch as the plaintiff would not be accountable over, in consequence of the conversion by the defendant, his recovery should have been limited to the amount of the unpaid balance of his mortgage debt.    The latter was, I think, the fair result of the evidence.    Mr. Lee was the president of the corporation, and he had the possession of the boats,

nominally as a private individual, and under a charter party to himself. But this was a mere cover; as the boats, up to the time of the surrender to the trustees, were run for the benefit of the corporation, and by its agents and servants. When the road, engines, cars, &c., came to be surrendered to the mortgage trustees, on the 6th October, 1854, they were also permitted to, and did, take the charge of the canal boats and run them, as they had theretofore been run, in connection with the road; they only engaging to indemnify Lee for any personal liabilities he had incurred by running them under the charter party. As to the road, the trustees were mortgagees in possession. The canal boats were not really embraced in the mortgage, but they had always been used in connection with the road; and the parties, namely, the officers of the corporation, on one side, and the trustees on the other, without making any question as to whether they were within the mortgage or not, consented that the trustees should take and use them. The trustees were, at least, the bailees of the corporation as to these boats, and they ought not to be made responsible to the plaintiff except for his actual damages. As to the remainder of the value of the boats, the trustees are accountable to the corporation or to its representative, and not to the plaintiff.

It follows that a new trial was properly ordered, on account of the erroneous rule of damages which was applied at the trial; and as the plaintiff has stipulated for judgment final against him if the order for a new trial should be affirmed, such judgment must be given, unless the plaintiff is permitted to withdraw his appeal and take a new trial. I am of opinion that he should be permitted to do this, upon the payment of all the respondent's costs of the appeal. Otherwise, there should be judgment final for the defendant.

I have not intended to make a precise statement of the account, but only to examine it so far as was necessary to determine that the balance was less than the recovery, but that it was so considerable that it would be unjust to hold the plaintiff to his stipulation.

It will be subject to adjustment on another trial.

SELDEN, J., expressed no opinion; all the other judges concurring,

Ordered accordingly.