JOHN H. ALEXANDER AND JAMES S. ALEXANDER, PLAINTIFFS, *v.* ANDREW J. BROWN AND OTHERS, DEFENDANTS.

*Corporation—powers of its officers—Receiving benefits of contracts—effect of.*

A corporation was created under the general act for the purpose of working certain coal mines and transporting the coal to market and selling the same. Before any coal had been mined, orders for coal were received from different persons, to fulfill which the president of the corporation, without any express authority from the trustees, entered into an agreement with the plaintiff, by which the latter was to deliver the coal to the persons ordering the same upon the credit of the corporation, which was to collect the amount due from the persons receiving the same. In an action by the plaintiff to recover the value of the coal so delivered, it was claimed that the president had no authority to make such contract, and that the corporation was not bound thereby. *Held,* that the officers of the company were authorized to contract for the delivery of the coal before the same had been mined, and that upon discovering that the corporation was unable to fulfill the contract, they were authorized by virtue of their office and employment to contract with the plaintiff for the fulfillment of the same.

After the delivery of the coal the corporation collected a great part of the amounts due therefor, from the persons receiving the same, and appropriated the money to its own use. *Held,* that it was thereby estopped from denying the authority of its officers to enter into the said contract or its liability thereunder.

MOTION for a new trial on exceptions ordered to be heard in the first instance at the General Term, after a verdict directed in favor of the defendants.

*John E. Parsons,* for the plaintiffs. The company were incorporated to mine and vend coal. This implies the acquisition of it. If the certificate does not imply a power to purchase, it does not prohibit it. ·The present doctrine in England is, that if it is not made out that the act of incorporation prohibits the contract, it must be enforced. (*South Yorkshire R. Co.* v. *Great Northern R. Co.,* 9 Exch., 56, 85 ; *Bateman* v. *Ashton-under-Lyne,* 3 H. & N., 323 ; *Norwich* v. *Norfolk R. Co.,* 4 Ellis & B., 397.) In the United States the doctrine is construed much more strongly against corporations. (*Moss* v. *The Rossie Lead Mining Co.,* 5 Hill, 137 ;

*State of Indiana* v. *Woram*, 6 Hill, 33 ; *DeGroff* v. *The Am. Linen Thread Co.*, 21 N. Y., 124 ; *Bissell* v. *The Mich. S. R. R. Co.*, 22 id., 258 ; *Parish* v. *Wheeler*, 22 id., 494 ; *McCutcheon* v. *Steamboat Co.*, 13 Penn., 13 ; *Allegheny City* v. *McClarkson*, 14 id., 83 ; *Chester Glass Co.* v. *Dewey*, 16 Mass., 94, 102 ; *Bulkley* v. *Derby Fishing Co.*, 2 Conn., 252–255 ; *Parker* v. *Boston and Maine R. R. Co.*, 3 Cush., 107, 108 ; 29 Vt., 93.) And to the like effect. (*Silver Lake Bk.* v. *North*, 4 Johns. Ch., 370 ; *L. and F. Ins. Co.* v. *Mech. F. Ins. Co.*, 7 Wend., 31 ; *Palmer* v. *Lawrence*, 3 Sandf. [S. C.], 170 ; *Sacketts Harbor Bk.* v. *Lewis Co. Bk.*, 11 Barb., 213 ; *Bk. of Genesee* v. *Patchin Bk.*, 13 N. Y., 309 ; *Steam Nav. Co.* v. *Weed*, 17 Barb., 378.) Persons may safely deal with the officers of a company at its office, and transactions made by them in the name of the company and which the company has the right to make are binding upon it. (*Howland and Aspinwall* v. *Meyer*, 6 Conn., 290 ; *Conover* v. *Mut. Ins. Co., etc., of Albany*, 3 Den., 254 ; *The Bk. of Vergennes* v. *Warren*, 7 Hill, 91, and cases cited in the opinion ; *Hascall* v. *Life Assn. of America* [Ct. App., 1876], not yet reported.)

*W. W. Niles*, for the defendants. This corporation was created to mine coal and sell it. It had no power to speculate in coal nor to become a mere coal merchant. The powers of a corporation must be determined by construing the language of its charter neither strictly nor liberally, but according to the fair and natural import of it, with reference to the purposes and objects of the corporation. (*The Toll Bridge Co.* v. *The H. and R. H. R. R. Co.*, 17 Conn., 454 ; *Downing* v. *Mt. Wash. R. R. Co.*, 40 N. H., 230 ; *Kean* v. *Johnson*, 1 Stockt., 401.) A corporation is restricted both to the thing allowed by the legislature to be done and the mode prescribed for its exercise. (*The Farmers' Loan and Trust Co.* v. *Carroll*, 5 Barb., 613 [see 649].) It has no power except what is given by its incorporating act, either expressly or as incident to its existence. (*Beatly* v. *Knowler*, 4 Peters, 152 ; *Brady* v. *The Mayor, etc.*, 20 N. Y., 312 ; *Jackson* v. *Brown*, 5 Wend., 590 ; *Salem Mill Dam Co.* v. *Ropes*, 6 Pick., 23.) The party claiming under a contract must show it to be within the powers of the officer alleged to have made it. (*Farmers' Bk. of Bucks Co.* v. *McKee*, 2

Penn. St., 318; *Blue* v. *Bear River Co.*, 20 Cal., 602.) It has been held that even a subsequent ratification by the directors will not render other contracts valid. (*McCullough* v. *Morse*, 5 Den., 567; *Dubois* v. *N. Y. C. and H. R. R. R. Co.*, 1 N. Y. Leg. Obs., 362.) The claimant must show not only that the agent had authority to bind, but that the company had the faculty to become bound. (*Hardwood* v. *Haines*, 9 Ala. [N. S.], 659.)

DANIELS J.:

This action was brought to recover from the defendants, as trustees of the New York Mutual Coal Company, the amount of a debt claimed to be due from the company, on the ground that no annual report of the amount of its capital and of the proportion actually paid in, and the amount of its existing debts, was made, published, or filed, as the statute required that to be done. (2 R. S. [5th ed.], 661, § 35.)

According to the description given of its business in the certificate of incorporation, the company was formed to work coal mines in a certain specified locality, and transport to market and sell such coal. The business of selling coal was not otherwise in terms included within that mentioned in this document. As it was described, the company was by mining to produce its own coal, and it was empowered to sell that which was obtained in that manner; but at the same time it was not prohibited from obtaining coal from other sources, in case that should become necessary to perform its engagements. It had its office in the city of New York, where its affairs were managed by its treasurer and secretary, and before it had the coal from its own mines to deliver, it received orders for coal from its customers. Being apparently unable to furnish it in any other manner, these officers procured the plaintiffs to deliver it on its credit, and with the understanding that they could also make collections from the persons receiving it. This arrangement was entered into with the advice and sanction of the president of the company, but without the action or authority of the trustees, except as that was to be inferred from the fact that the officers were allowed to transact and control its business. They were in the ostensible charge of its affairs, and to their apparent authority, as it was so exhibited, the plaintiff trusted in entering into the agreement

which was made. And under that, upon orders sent to them by the secretary and treasurer, coal was delivered to the customers of the company by the plaintiffs to the amount of $962, and $814.50 of that amount remained unpaid. It appeared that a bill had been rendered which was admitted as correct by the treasurer, who promised to pay the balance remaining unpaid. The court held that the evidence given did not establish the existence of a debt against the company, as it appeared it had not been actually authorized or sanctioned by the trustees, and its creation was not within the scope of the authority given to the officers, under whose direction the coal had been delivered.

But as the company was created to mine and sell its own coal, and its officers were, by virtue of their appointment, authorized to carry on its business to that extent, they were practically empowered to receive orders and enter into engagements for the delivery of coal to its customers. That was a part of its legitimate and lawful authority according to the terms of the certificate of incorporation. It was not bound to wait until the coal was obtained from its mines and was on hand ready for delivery, before it endeavored to obtain its customers and create a market for what it was expected it would afterwards have and be able to deliver. And when that was done, and it proved incapable of performing by delivering the coal itself for its own protection, its officers had the incidental authority, by virtue of their appointment and employment, to cause it to be done by the plaintiffs for the indemnity and protection of the company. Nothing appeared which subjected the conduct of the officers to suspicion. They appear to have acted in good faith for the preservation of the business and the retention of the customers of the company, and what they did, though not literally within the terms of the certificate of incorporation, was still within its spirit, and seemed necessarily to result from the state of its business. It was an emergency which had not been anticipated, and that was met and provided for in the way such business would ordinarily be expected to be done, and the plaintiffs ought not to be subjected to the loss of their property, because the certificate of incorporation had not in terms provided for its disposition. These corporations are created with so much facility, and are so extensively engaged in manufacturing and trading occupations, that persons dealing with

their agents and officers are compelled to rely upon the appearance of their authority to a great extent, and after they have done so, justice requires that the corporation should not be exonerated from liability after it has profited by the arrangement made, simply because it had described its business in such terms as not necessarily to include the transaction. The contract made with the plaintiffs appertained to what appeared to be, and what was, the business of the corporation, and it was within the spirit of the description given of it in the certificate, and it should have been held liable for the amount that had become due in the course of its performance.

It appeared further, that the proceeds of the coal delivered by the plaintiffs, on the orders of the officers of the corporation had been, to a great extent, collected and received by it, and used in its regular business. The evidence showing that to be the fact consisted of the statement of its treasurer, and it was received without objection as proper proof of that fact. For that reason it must be now regarded as properly in the case, even though not strictly admissible for that purpose. If it had been objected to as incompetent, the objection might have been obviated by other proof of the fact. That was not done, and the objection for that reason could not now be allowed to prevail, even if it had been taken in the course of the argument of the case on behalf of the defendants. The fact must be regarded as proved, that a great part of the money owing for the coal was collected and applied to the use of the company, as the treasurer admitted it had been; and that precluded the defendants from maintaining the position that the corporation had not become liable for the payment of this debt. It acted as corporations necessarily must act, through the intervention of officers who were its agents. To them it sustained the ordinary relation of principal, and one of the legal consequences of that relation is that the principal will become responsible for even unauthorized contracts of the agent, when he has received and enjoyed the proceeds of them. The advantages cannot be secured and appropriated without, at the same time, rendering the principal liable for the instrumentalities through which they may be obtained. This rule is well settled, and no good reason appears for exempting trading corporations from its operation and effect.

The general rule of law upon this subject is that the principal

who reaps the benefit of a transaction must also bear the burthens of its responsibilities. Parsons, in his work on Mercantile Law, page 137, states the rule in these terms: "Generally, one who receives and holds a beneficial result of the act of another, as his agent, is not permitted to deny such agency, and in some cases this is extended even to acts of such agent under seal." Cowen says: "My servant borrows fifty dollars, which comes to my use, and gives a note in my name for it; I am bound, though I have not instructed him to do such acts, but it would be otherwise if the money did not come to my use; and where A.'s known servant pawns his master's ox for corn, and agrees that if he does not pay so much for the corn by such a day, that the pawnee may keep the ox, if the corn comes to the master's use the master cannot retake the ox if the money is not paid." (1 Cowen's Treat. [2d ed.], 76.) *Bolton v. Hillersden* (1 Lord Raymond, 224; 3 Salkeld, 234) was an action on a promissory note given in the defendant's name by his apprentice on the loan of £100; the defendant proved that he did not trust his apprentice to give such notes; the apprentice swore that he had lost £100 of his master's money at play, and that the day following a foreign bill was drawn upon his master, which he could not pay, therefore he resorted to the plaintiff, with whom the defendant usually had dealings, and because the person who brought the foreign bill would not receive guineas, being the only money he had, he persuaded the plaintiff to receive the guineas and pay the bill, which he did, and the apprentice gave the note to him for money received of him to pay the £100 which he had lost at gaming. Holt, chief justice, in deciding the case, said: "If a master has never entrusted a servant to charge him by signing of notes in the master's name, yet if the money for which such note is signed comes to the use of the master, or if in this present case the servant gave the note to raise money to pay the foreign bill charged to his master, which is for the benefit of his master, such note will bind the master, though he never permitted the servant to sign such notes before."

In *Precious v. Abel* (1 Esp., 350), an action was prosecuted to recover for work done by a farrier in shoeing and physicing a horse; the defense was that the defendant, by an agreement with his groom, allowed him five guineas a year, for which he was to

keep the horses properly shod and furnish them with proper medicines when necessary. Lord Kenyon, chief justice, held that it was no defense unless the plaintiff knew of the agreement; that if the servant buys things which come to his master's use, the master should take care to see them paid for, for a tradesman has nothing to do with any private agreement between the master and servant." And it was held in *Brower* v. *Lewis* (19 Barb., 574), where an agent had sold goods by sample that "if the broker had no authority to sell by sample, which was not shown at the trial, still the plaintiffs cannot affirm the sale made by him and get an increased price on account of the warranty made by him, and keep it, and say that they did not authorize the warranty." In *Bennett* v. *Judson* (21 N. Y., 238) the judge before whom the action was tried charged the jury, that if the agent had practiced a fraud in making the bargain with the plaintiff, the defendant having received the fruits of the bargain was liable for the fraud, although he did not authorize the statement or know that it was made, or whether it was true or false. And that was held to be a correct exposition of the law by the Court of Appeals. In *Elwell* v. *Chamberlain* (31 id., 611, 619) it was likewise acted upon and the preceding decision upon this point was approved. The case of *Rimell* v. *Sampayo* (1 Car. and P., 254) in its effect proceeded upon the same principle. It extends through all this class of cases, and in *Parish* v. *Wheeler* (22 N. Y., 494) it was held applicable to the dealing of a corporation. In deciding that case it was said by Comstock, Ch. J.: "There is certainly no moral turpitude if a railroad corporation buys a steamboat or builds a church, nor is there any legal turpitude. It may be an excess of power, or a breach of private trust in respect to its stockholders. The latter may complain or the State may interpose, but corporations themselves, like individuals, in dealing with other parties, must live up to the rules of common honesty." (Id., 507.)

A debt against the corporation in favor of the plaintiff was established by the evidence as it was taken upon the trial, and it was not claimed that the defendants were not liable for its payment, if that were the fact, under the provision of the statute

declaring the effect of their failure to make, publish and file the report required by its enactment.

The verdict should therefore be set aside and a new trial ordered, with costs to abide the event.

DAVIS, P. J., and BRADY, J., concurred.

Verdict set aside, new trial ordered, costs to abide the event.