## Town of Verona *vs.* Peckham and Hess.

By resolutions passed by the electors of a town, at a town meeting, it was resolved, 1st. That the town proceed to pay a bounty of $600 to each volunteer or substitute who should be mustered into the service of the United States for one year; $800 to each volunteer, &c., for two years; and $1,000 to each volunteer, &c., for three years, under the call of the President, and who should be credited to such town. 2d. That a reward of $25 be paid to each person who should enlist a volunteer or procure a substitute to the credit of the town. 3d. That the board of town auditors be authorized and directed to raise, on the credit of the town, the sum of $94,000. 4th. That the supervisor be authorized and directed to pay to each volunteer and substitute the sum specified in the 1st resolution, and to every person enlisting a volunteer or substitute $25, on his voucher for such payment being audited and settled by the board of town auditors.

*Held* 1. That these resolutions, upon their adoption, became and were offers on the part of the town to pay the sums mentioned, to every person complying with the conditions, to wit, volunteering into the United States army for one, two or three years, being mustered into the service, and credited to the town.

2. That whenever it was shown, to the satisfaction of the supervisor that any person had performed these conditions, the contract with the town became and was valid and binding, so far as such resolutions could make it so, and the volunteer became entitled to the $600, $800 or $1,000, according to the time he had agreed to serve.

3. That the 1st resolution contemplated a contract, not with one man for fifty men, but separately with each and every man who should volunteer, and comply with the terms of the offer.

4. That an agreement between the town and P., by which the latter undertook to procure fifty volunteers to be enlisted and mustered into the service of the United States for the term of three years, each to apply on the quota of said town, for which he should be paid $50,000, in the bonds or certificates of the town, was void, being wholly unauthorized by any statute or by the town.

5. But that, although the town, and its agents, acted without authority in making the contract, yet that, P. having procured, and caused to be credited to the town, fifty three-years' men, and the town having received, through P., the whole benefit of the agreement, and performed, on his part, by paying over the money earned by him, the town could not repudiate the agreement and recall the money, or compel P. to account for the same, as its agent or trustee.

6. That as to the $25 per head, offered by the 2d resolution of the town meeting, the town had no right to recover it back from P. That the contract between P. and the town board being void, and P. having procured the men for the town, he came within the terms of the resolution; and that his right to the money was not impaired by his permitting a third person to receive it in consideration of services rendered to him by such third person.

And P. having received from the county, for the fifty men enlisted by him, $500 each, in accordance with a resolution of the board of supervisors offering that sum as bounty for each volunteer; *Held* that the amount of such county bounty should not be deducted from the $50,000 appropriated by the town; such county bounty not having been offered in lieu of the whole or any part of the bounty offered by towns or individuals, and the bounty offered by the town not being in lieu of the whole or any part of the bounty offered by the county, state or individuals.

Where money in the hands of a trustee has been applied to the legitimate purposes for which it was designed, with the consent of the *cestuis que trust*, the latter cannot recover it from the trustee, even though the use to which it was applied was illegal.

Although money may have passed into the hands of an individual in a way not authorized by law, yet if it was given him to be applied to a specific purpose, and he has so applied it, he cannot, in equity and good conscience, be called on to refund it.

APPEAL, by the plaintiff, from a judgment rendered at a special term held by BACON, J., dismissing the complaint, with costs.

The action was commenced in July, 1865, to compel the defendants to account for $50,000 of bonds issued by the town and delivered to the defendants, and for moneys of the town received by the defendants, and to pay over the amount which on such accounting should be found owing to the town.

The defence was, that there was a contract between the town and the defendant that he should be paid $50,000 for furnishing fifty men to fill the quota of the town, under the call of the President of the United States, of July 18, 1864, for 500,000 volunteers or substitutes, to be mustered into the service of the government; and that he had performed the contract, on his part, and become entitled to the sum stipulated, and which had been paid to him, in the bonds of the town, of which an account was sought.

The following facts were found by the judge who tried the cause:

1. The citizens of the town of Verona, at a meeting regularly convened on the 18th August, 1864, in appre-

Town of Verona *v.* Peckham.

hension of the draft then impending, to fill the call of July 18, 1864, for 500,000 men, resolved, substantially, that the town would pay a bounty of $600 for every man enlisted for one year, $800 for two years, and $1,000 for three years, who should be credited to the town, and in addition, that it would pay a bonus of $25 to each person who should enlist a volunteer or substitute; and they authorized the board of town auditors to raise, on the credit of the town, $94,000, or so much thereof as might be necessary to effect the foregoing object, and requested the board of supervisors to levy a tax upon the town to liquidate the debt thus to be created, and the supervisor of the town was directed, in substance, to carry out the plan and pay the moneys to be raised pursuant to the foregoing resolutions.

2. The draft was to be made on the 5th day of September, 1864, and the supervisor made repeated efforts in various directions to raise the money required to offer the proposed bounties, but was unable to effect it.

3. On the 28th of August, the defendant, Peckham, proposed to the supervisor to furnish fifty men for three years' service, each to be credited on the town quota, and to receive in payment therefor the bonds or certificates of indebtedness of the town, for the sum of $50,000. This was accepted and agreed to by the supervisor, and on the next day the town auditors were convened, the fact of the arrangement with Peckham communicated, and the terms assented to, and a resolution was offered and passed, in substance, by the board, to issue certificates of indebtedness, payable to the order of the defendant Hess, for $50,000, and to authorize Peckham to recruit fresh volunteers or substitutes to fill the town quota to the number of fifty men; and that the $50,000, or so much thereof as should be necessary, be used for paying the town bounty to said recruits.

4. The bonds or certificates of indebtedness to the amount of $50,000 were on the same or the subsequent

day delivered to the defendant Hess, by the supervisor, under authority of the board, for transmission to New York, (where Peckham had gone and was intending to procure the fifty men,) with directions to distribute and deliver them from time to time as men should be secured, and with injunctions to use them for that purpose, and to be satisfied that the men were properly enlisted and were to be applied to the benefit of the town on its quota.

5. Before the 5th of September, the defendant, Peckham, had succeeded in furnishing fifty men, all for three years' service; the proper certificates were procured and delivered to the provost marshal of the 21st district, and the town of Verona got the full credit for the fifty men for three years' service; and the bonds of the town, to the value of $50,000, agreed to be paid to Peckham, were delivered to him in fact to raise the money, and went into the hands of third parties, and were ultimately paid by the town.

6. After the fifty men had been thus secured, upon an allegation that the town quota was 108 instead of ninety-four, as had been assumed, the defendant Peckham was induced, by the solicitation of some citizens of the town of Verona, to return to New York, and procure eleven more recruits, all but two of whom were for three years' service, the credits for some nine of which came through the regular channel, and the town received the benefit thereof by that reduction of its quota.

7. In the month of June, 1865, the authorities of the town of Verona, through the present supervisor, made an application to the state officers for reimbursement of bounties paid under the act of 1865, upon a claim that the full quota of the town (108 men) had been filled, and that thereby the said town had furnished an excess of years of service to the number of 157, and under this claim (to establish which the town included and claimed and received credit for all the men that had been so fur-

nished by Peckham) there was recovered by the town of Verona, from the treasury of the state, the sum of $27,000.

The judge found, as matter of law, that no case had been made requiring an accounting from the defendants, or either of them, but that the defendants were entitled to a dismissal of the complaint, with costs. He therefore ordered judgment for the defendants, that the complaint of the plaintiff be dismissed, with costs to the defendants.

*F. Kernan,* for the appellant.

*Johnson & Boardman* and *R. Conkling,* for the respondents.

*By the Court,* MULLIN, J.  A town is a corporate body clothed with powers that are deemed by the legislature sufficient to enable it to perfórm all the duties devolving upon it, and it has no powers except such as are expressly conferred, or such as are necessary to enable it to carry into effect such as are conferred. The powers are: 1st. To sue and be sued.

2d. To purchase and hold land within its limits and for the use of its inhabitants.

3d. To make such contracts, and to purchase and hold such personal property, as may be necessary to the exercise of its corporate powers; and

4th. To make such orders for the disposition, regulation or use of its corporate property as may be conducive to the interests of its inhabitants. (*R. S., part* 1, *ch.* 11, *tit.* 1, *art.* 1, § 1.)

The second section is as follows: "No town shall possess or exercise any corporate powers except such as are enumerated in this chapter, or shall be expressly given by law, or shall be necessary to the exercise of the powers enumerated or given."

None of the powers thus expressly conferred are broad enough to enable a town to make the contracts under which it is claimed the defendants in this case obtained the $50,000 from the plaintiff.

The eighth section of the second title of the same chapter, which defines the powers of town meetings, gives no authority to such meetings to make any such contract.

I have searched the session laws passed since the breaking out of the rebellion in vain for an act conferring on towns or town meetings any such power. So far from there being any such authority, the 3d section of chapter 184 of the laws of 1863 expressly forbids any county, city, town or municipal corporation to raise or expend any money or incur any liability for paying bounties to volunteers. It will be remembered that the town meeting that voted the money in question was held in August, 1864. The only act which can be claimed to give color for authority to make such a contract, passed prior to such town meeting, is the 22d section of chapter 8 of the laws of 1864. By that section, the boards of supervisors of the several counties were authorized, at any meeting duly called, to adopt resolutions, and provide for raising money, upon any town, for the use of said town, and to levy a tax upon such town, for the purpose of paying bounties to volunteers into the military or naval service of the United States, and for the purpose of paying the incidental expenses of such volunteering, and of raising such moneys, and for the purpose of furnishing temporary relief to the families of such volunteers. But no such money could be raised in any town except upon a vote of a majority of the electors of such town, present and voting at an annual or special town meeting in such town.

There is a provision in chapter 184 of the laws of 1863, being section 3d of that act, which provides that no county, city, town or other municipal corporation, or person

or recruiting officer of any other state should thereafter offer, raise or expend any money or incur any liability, for the purpose of giving or paying bounties; but that provision was not to apply to the action of any county in relation to bounties paid or promised prior to the passage of said act, nor so as to prevent the payment of any sums to procure substitutes for persons drafted.

There are several acts authorizing the payment by towns of such moneys as individuals had advanced to procure enlistments, and for the support of the families of volunteers and satisfying taxes assessed for the same purposes. But none of these acts authorized any future expenditure for such purposes. The act of 1863, above cited, has never been repealed, except so far as the 3d section of chapter 8 of the laws of 1864 may operate as a repeal or modification of said section.

The act of 1864 did not authorize or contemplate the issuing of bonds or other evidences of debts by towns. The towns were authorized to hold meetings and vote an amount of money for the uses and purposes specified in such act; and the boards of supervisors were authorized to raise by tax on the towns voting moneys the sums so voted.

It is not perhaps necessary, for the purposes of this case, to inquire whether the certificates issued by the board of town auditors were valid, inasmuch as both parties to this action proceed on the assumption that they were valid. But if that question was here I should be constrained to hold that they were issued without any authority.

Section 22 of chapter 8 of the laws of 1864 authorizes money to be raised by the towns for the purpose of paying bounties, expenses incidental to volunteering, and of raising the money to be expended for such purpose, and of furnishing temporary relief to the families of those volunteering.

None of these statutes contemplate or provide for

making a contract with individuals to furnish volunteers, except it be to pay to those who furnished them a compensation of $25 a man, for their services in so doing.

The arrangement made between the board of town auditors and Peckham, as found by the judge who tried the cause, was that he—Peckham—would procure fifty volunteers to be enlisted and mustered into the service of the United States for the term of three years, each to apply on the quota of said town, for which he should be paid $50,000 in the bonds or certificates of indebtedness of said town bearing interest. The town was authorized to raise money to pay bounties, incidental expenses and for the support of the families of volunteers. This contract does not provide for either. It is an agreement with a bounty broker to procure men to apply on the quota of the town, and is therefore one of those nefarious arrangements which cost the people so many millions of money, yet it is very doubtful whether a single man was furnished, while 100 were paid for.

It is no answer to say that by means of this arrangement the same end was attained that was contemplated by the statute and the electors of the town. This same answer could always be made when illegal means are resorted to, to attain a legal result. If a town owes money and is authorized to raise it by tax, but instead of doing so it raises it by mortgage on the lands of the town, is the mortgage valid? I apprehend not. The end does not always legalize the means, any more than it justifies the means.

But not only was the contract thus formed unauthorized by any statute, but it was unauthorized by the town. The pretended arrangement was made under and pursuant to resolutions passed at a meeting of the electors of said town held on the 18th of August, 1864. The first of these resolutions is as follows: "Resolved, 1st. That the town of Verona proceed to pay a bounty of $600 to each volunteer or substitute who shall be

Town of Verona *v.* Peckham.

mustered into the service of the United States for one year, $800 for two years, and $1,000 for three years, under the last call for 500,000 men, and who shall be credited to the town of Verona.

Resolved, 2d. That a reward of $25 be paid to each person who shall enlist a volunteer or procure a substitute to the credit of the town, such amount to be paid on the certificate of the provost marshal that such volunteer or substitute has been regularly mustered into the service of the United States."

The 3d resolution authorized the board of town auditors to raise, on the credit of the town, the sum of $94,000, or so much thereof as may be necessary to carry out the foregoing resolutions.

"Resolved, 4th. That the supervisor be and he is hereby authorized and directed to pay to each volunteer and substitute the sum in accordance with the first resolution, and to every person who shall enlist a volunteer or a substitute the sum of $25, and that his voucher for such payment, when properly authenticated, be audited and settled by the board of town auditors.

These resolutions, after their adoption by the meeting, became and were offers on the part of the town to pay the sums indicated to every person complying with the conditions, to wit, volunteering to service in the United States army one, two or three years, being mustered into the service and credited to the town. Whenever it was shown to the satisfaction of the supervisor that any person had performed these conditions, the contract with the town became valid and binding, so far as these resolution could make it so, and the volunteer became entitled to the $600, $800 or $1,000 according to the time he had agreed to serve. The first resolution contemplated a contract not with one man for fifty men, but separately with each and every man who should volunteer and comply with the terms of the offer.

For these reasons I am of the opinion, that the agree-

ment found to have been made between the town and Peckham was wholly unauthorized and void.

The court finds that the certificates issued by the board of auditors, passed into the hands of Peckham, who procured the money thereon, and the said certificates were afterwards paid by the town. If am right in supposing the contract to be invalid, it remains to enquire whether the town can call upon Peckham, the person receiving these certificates, or the money of the town, to account for the same.

Assuming, for the purposes of this question, that Peckham procured, and caused to be credited to the town, fifty three-years' men, it would follow that although the town and its agents acted without authority in making the contract, yet it received, through Peckham, the whole benefit of the agreement, and performed on its part by paying over the money earned by him. The question then is, can the town repudiate the agreement and recall the money, or compel Peckham to account for the same, and if it can, upon what terms and to what extent ?

The rule was formerly applied with great rigor, that all acts done by a corporation, without authority of the legislature, set forth in its charter, were utterly void. But this rule has been very much modified, and acts done without authority have been held binding.

In *Moss* v. *The Rossie Lead Mining Company*, (5 *Hill*, 137,) the action was on a note given to the plaintiff by the corporation, in payment for property received and used by it. The defence was, that the note was given for property which the company had no power under its charter to buy. It was held that the corporation was estopped from alleging its want of authority, having purchased and used the property. The ground of the decision was, that persons selling property to a corporation, ordinarily could not know whether the property was such as it might lawfully purchase, and

Town of Verona *v.* Peckham.

hence, unless they knew that the company was acting in fraud of its charter, and knowingly sold to it for the purpose of effecting the fraud, the sale is valid.

In *The State of Indiana* v. *Woram*, (6 *Hill*, 33,) the action was on an agreement duly executed by the Staten Island Whaling Co. to pay to the order of the defendants $15,000, and which agreement or obligation was transferred to the plaintiff in payment of bonds of the plaintiff sold and transferred to the Whaling Co. Woram and the other defendants guaranteed the payment of this obligation. There was a demurrer to twenty-eight out of thirty counts of the declaration, and joinder. Amongst other grounds insisted upon as releasing the defendants from liability was the want of power in the Whaling Company to purchase the bonds of the plaintiff. It was incorporated for the purpose of engaging in the whale fishery and in the manufacture of oil and spermaceti candles. Bronson, J., in delivering the opinion of the court in favor of overruling the demurrer, says: "I agree with the counsel for the defendants that this company had no authority to purchase or deal in these bonds, but since the decision in *Moss* v. *The Rossie Lead Mining Company*, (*supra*,) I do not see that a corporation can ever avoid its obligations on the ground that they were given for property which the corporation was not authorized to furnish."

It was held in the *Steam Navigation Compang* v. *Weed*, (17 *Barb.* 378,) that a defendant who borrowed $1,000 for a day could not defeat an action for its recovery by showing that the plaintiff had not power by its charter to make the loan.

Chancellor Kent, in *Silver Lake Bank* v. *North*, (4 *John. Ch. R.* 370,) refused to annul securities given on a loan made without authority.

In the case of the *Chester Glass Company* v. *Dewey*, (16 *Mass.* 94,) the court held that the defendant could not avail himself of the defence that the goods for the

price of which the action was brought were sold in violation of the plaintiff's charter. (*See, also, McCutcheon* v. *The Steamboat Company,* 13 *Penn. R.* 13 ; *Palmer* v. *Lawrence,* 3 *Sandf.* 170 ; *Potter* v. *The Bank of Ithaca,* 5 *Hill,* 490 ; *Suydam* v. *The Morris Canal Company,* 5 *Hill,* 491, *note ; Sackett's Harbor Bank* v. *The Lewis County Bank,* 11 *Barb.* 213.)

In *De Groff* v. *The American Linen Thread Company,* (21 *N. Y.* 124,) it was held, that a sale of property by a corporation in which, by its charter, it had no power to deal, was valid and an action might be maintained for the price.

In *Parish* v. *Wheeler,* (22 *N. Y.* 494,) the principle decided in the preceding cases is reiterated, and this proposition is asserted, to wit, that when a corporation purchases property without authority and sells the same and takes a mortgage on it as security, it cannot refuse to apply payments made upon the mortgage by reason of its want of authority.

It will be seen that in these cases, and I apprehend in all others in which the same principles are put forth, the corporation was a party to the act done in violation of its charter, and which it, or the other party to the transaction, sought to repudiate as *ultra vires.* In the case in hand, the contract which is relied upon by the defence was never made by the town, nor in pursuance of any authority conferred by the town upon its agents, nor was it ever ratified or adopted by it. The town meeting was the only authority that could bind the town, the contract made with Peckham was never submitted to it and could not therefore be ratified or adopted by it, and the board of town auditors had no power to bind the town by any ratification. The money that was received by way of bounty, from the state, for a part of the recruits obtained by Peckham might have been submitted to a jury as evidence of ratification, if it had been known to the town meeting. But it does not appear

that the receipt of that money was communicated at any meeting of the inhabitants.

The case being relieved from anything that operates by way of estoppel, we come next to the question whether Peckham is liable to account to the plaintiffs for the moneys received by him as agent or trustee of the town?

That he received the $50,000 is conceded; and if it was not received by virtue of a contract by which he was legally entitled to hold it as against the town, he must have received and held it as agent or trustee, and is bound to account for it as such.

The supervisor was authorized by the fourth resolution of the town meeting to pay over the money voted by the town to "each volunteer and substitute," and to the persons who should enlist volunteers.

The defendant Peckham was not therefore an agent appointed by the town, and could only become such by appointment of the supervisor or the town board. Neither gave him any such appointment, and he could only become such in equity, by reason of his possession and use of the moneys of the town to which they were justly entitled and which he in conscience could not retain from it. (2 *Story's Eq.*, § 1255. *Randal* v. *Cochran*, 1 *Ves. sen.* 98. *Varet* v. *N. Y. Ins. Co.*, 7 *Paige*, 560, *affirmed in Court of Errors*, 24 *Wend.* 505.)

Considering Peckham as agent or trustee of the town, (and the town elects so to treat him,) then, he received the money, to be applied in payment of bounties to volunteers who should be credited on the quota of the town under the call of the President for 500,000 men. Peckham avers that the money so received by him has been so applied. That is to say, he received the money and procured the fifty men to be mustered into the service who were credited on the quota of the town, and thus the money received has been applied to the legitimate purposes for which it was designed. In such a

case the *cestuis que trust* consenting to the illegal use of the money if it was illegal, cannot recover it of Peckham. (*Brice* v. *Stokes*, 11 *Ves.* 319. *Nail* v. *Prentis*, 5 *Simons*, 555.)

If the action was on the contract found by the court to have been entered into, between the town board and Peckham, he would have been compelled to show substantial performance on his part; but in this action for an account I think it is enough that he shows that he may equitably retain it. In other words, that his retention of it is not unconscientious.

It was proved on the trial that Peckham, after making the arrangement to procure men to apply on the quota of the town, went to New York, raised money on the bonds of the town, and procured fifty men who enlisted for the term of three years to apply on the quota. He did not see more than six or seven of the men mustered in, nor did he pay the money to the men himself, but he paid it to the persons who procured the men for him. That he paid for these men more than the $50,000 received by him from the town. He furnished a list of the names of the fifty men procured by him, and these fifty names are found on the books of the provost marshal's office credited to the town of Verona.

The fact of credit is proved by entries in two books, one kept in Elmira, and one in Utica, and the entries in the last mentioned books were made from letters and papers sent from the office in Elmira, and which books were transferred to and are now deposited in the assistant adjutant general's office in Albany. The original enlistment papers and muster rolls were not produced, and because of the non-production of these, the plaintiff's counsel objected to the evidence so derived from the books as not the highest or the best. I understood Crandall, who had been provost marshal for the Oneida congressional district, for a few months, to testify that the two books produced were the original books of

Town of Verona *v.* Peckham.

credit; that they were made in the office and contained the account with the towns, of the men furnished under the several calls.

It is difficult to determine what is the best evidence of the doings of these marshals' offices. Whether there were any papers kept is not proved in this case, and I doubt whether it could be proved in many of them. I think on the evidence of Crandall we must take the books as evidence that the fifty men obtained by Peckham were credited to the town, and as they could not have been properly credited until after they had been mustered in, we must presume that the officers did their duty, and hence that the men were duly mustered into the service. The due performance of assured duty is in all cases presumed.

Again, it is not claimed that the town has ever been called on to pay the men procured by Peckham. But it does appear that the town received from the state the money to which it was entitled by reason of an excess of men furnished by it, and which excess was occasioned in part by the credit of the fifty men furnished by Peckham.

If I am right in this, it follows that the whole money of the town was applied by Peckham in procuring fifty men to be, and who were passed to its credit on the President's call, and that this was the use for which such money was raised.

Now although the money may have passed into the defendant's hands in a way not authorized by law, or even in violation of law, yet it was given him to be applied to a specific purpose and having so applied it, he cannot in equity and good conscience be called on to refund it.

This disposes of the claim for the $50,000. If it be true that Peckham paid for the fifty men (and there is nothing to contradict him) more than this sum, there is

no part of it in his hands which can be justly demanded by the plaintiff.

As to the $25 per head, offered by the second resolution of the town meeting, I am of opinion the town has no right to recover it from the defendant. If the contract, which the court finds was made between Peckham and the town board had been valid, it is possible that Peckham would have been entitled, as against the town, to the $50,000 only. But that contract being void, and Peckham having procured the men for the town, it seems to me he comes clearly within the terms of the resolution. His right to the money is not impaired by permitting Hess to receive it in consideration of services rendered to him by Hess.

The plaintiff's counsel further insists that from the $50,000 appropriated by the town, should be deducted the bounty of $500, offered by the county, for each volunteer mustered into the service of the United States, for three years, which was to be paid when the men were accepted, and mustered in, and credited to Oneida county, or any sub-district therein, from and inclusive of the 13th of July, 1864, until the quota of the county should be filled.

It was conceded that Peckham received from the county for the fifty men enlisted by him $500 for each man, in accordance with the resolution of the board of supervisors offering the bounty.

This bounty was not offered in lieu of the whole or any part of the bounty offered by towns or individuals; nor was the bounty offered by the town, in lieu of the whole or any part of the bounty offered by the county, state, or individuals. There was therefore no pretence for saying that each volunteer entering the service, after the offer of these bounties, on being mustered in and credited to the quota of the county of Oneida, or the town of Verona, was not entitled to both bounties; and if the volunteer can demand it, I can perceive no reason

why Peckham was not entitled to it. The county might with the same propriety have claimed that the bounty offered and paid by a town, should go in reduction or satisfaction of the bounty offered by the county. I do not think the town has any right to ask that the county bounty be deducted from the $1,000 offered by itself.

In the uncertainty that surrounds the whole proceedings of those concerned in mustering volunteers into the service of the United States, it is quite possible that the government never obtained a man of the fifty for which these enormous bounties were paid. But on the evidence the fact must be assumed to be, that these men entered the service, and that they received the bounties offered by the county and town; and that being so, there is no ground on which this action can be maintained.

No cause of action was proved against Hess, and the judgment as to him was clearly right.

The judgment should be affirmed with costs.

Judgment affirmed.

[ONONDAGA GENERAL TERM, October 1, 1867. *Morgan, Bacon, Foster* and *Mullin,* Justices.]