BiciiardsoN, J.,
dissenting:
I concur with, all my associates in bolding that tbe claimant is' entitled to recover tbe $12,080.20 paid into tbe Treasury by tbe marshal from tbe proceeds of bis cotton captured in rebel territory, and after tbe passageof tbe Act of March 12,1863, brought into a loyal State, and in possession of an officer of tbe Navy, without having been libled previously thereto for forfeiture under tbe provisions of tbe Aot July 13,1801, § 5 (12 Stat. B., 257), nor seized by order of tbe President at any time under' tbe provisions of tbe Aot July 17, 1802, §§ 5, 6, 7 (12 Stat., 590), so much having reached tbe Treasury as tbe proceeds of captured cotton and being still held by tbe defendants for tbe loyal owner; but I am constrained to differ from tbe majority in giving judgment for that which did not so come into their control and which is not now in their Treasury.
Tbe difficulty with this branch of tbe claimant’s case is that tbe money decreed to be paid to Captain Pennock lost its identity, was covered into tbe Treasury as prize-money belonging to tbe captors upon an order issued by a court of competent-jurisdiction in admiralty, was so entered in the books of tbe department, was known to tbe defendants only as such prize:money, and was paid out, as it was received, under tbe same order of tbe same court, acting under tbe statutes then in force for tbe distribution of prize-money, in pursuance of a permanent appropriation made by law, and without notice of tbe present claim.
It cannot be doubted that tbe decree of tbe district court in Illinois, ordering one-half of tbe proceeds of tbe cotton condemned to be paid to Captain Pennock, as informer, was irregular and not warranted by law. Nevertheless, tbe decree was obeyed and acted upon, and tbe money, with other money decreed ill like manner in other cases, to tbe amount, in all, of $59,943.42, was paid to Captain Pennock by tbe marshal by bis check therefor on an assistant treasurer, not on tbe Treasurer, for tbe money bad not reached tbe Treasury, and was not subject to tbe constitutional provision that “ no money shall be drawn from tbe Treasury but in consequence of appropriations made by law,” but was subject to tbe order of tbe court. Captain Pennock, while be did not aepept tbe same for bis own use, did receive it and hand it to Admiral Porter, whom be regarded *52 as tbe real informer. And Admiral Porter, when he, too, declined to appropriate it to his own use, did accept it for the officers and men of his squadron. He deposited it in his own name, and subsequently drew his own check for the amount against the same deposit, and voluntarily surrendered-this, his own check, into the control of the district court of the District of Columbia, a court having full admiralty jurisdiction, for distribution as captors’ prize-money. The check was indorsed “Prize-money of Mississippi squadron, deposited with assistant treasurer, by order of the Secretary of the Navy, by Bear-Admiral David D. Porter, commanding Mississippi squadron.”
Thus the proceeds of the claimant’s cotton, to that extent, lost its identity as against all persons except those having actual notice. Without the restricted indorsement Admiral Porter might have passed this check to anybody for value received without subjecting the receiver to liability on account of the manner in which the Admiral obtained the money on deposit against which it was drawn, and that indorsement only stamped it with notice that it was prize-money.
By the Act March 3, 1803, chapter 91, § 3 (now Bev. Stats. Dist. of Col., § 7G2), it was provided, with refereene to justices of the Supreme Court of th¿ District of Columbia, that “ any of said justices may hold a district court of the United States for the District of Columbia in the same manner and with the same powers and jurisdiction possessed and exercised by other district courts of the United States.” This gave to that court jurisdiction “of all causes of admiralty and maritime jurisdiction * * and of all seizures on land and on waters not within admiralty j urisdiction * * and original and exclusive cognizance of all prize brought into the United States except” property used, &c., in aid of insurrection, as set forth in the several acts now incorporated into Bevised ’Statutes, § 563, ¶ 8; § 629, ¶ 6; §§ 5308, 5309.
The Act June 30, 1864, chapter 174, § 16 (now Bev. Stats., § 4641), provided, in relation to prize, “that the net amount decreed for distribution to the United States, or to vessels in the Navy, shall be ordered by the court to be paid into the Treasury of the United States to be distributed according to the decree of the court; and the Treasury Department shall credit the Navy Department with each amount received, to be distributed to vessels of the Navy; and the persons entitled to share therein *53 shall be severally credited in their accounts with the Navy Department with the amounts to which they are respectively entitled.”
It is only with orders of the courts made under this provision that the Treasury Department has any concern. If money comes through,a court of such general jurisdiction, declaring it to be prize-money, and ordering its payment into the Treasury, and its distribution among the vessels of the Navy named in its decree, the officers of the Treasury are bound to respect it, and it is no part of their official duty to inquire into the sources from which the money may have been derived, nor to determine whether or not the court has erred in its judgment in holding it to be lawful prize-money, nor to inspect all the records to ascertain whether or not the court may not have committed errors in the forms of proceeding, or even made a mistake in taking jurisdiction at all. They are not to sit in review of the proceedings of a Federal court whose order comes to them in relation to a subject-matter over which it has general jurisdiction.
And especially is it their duty to respect such a decree in whole, if at all. If they accept the money, according to the terms of the decree, as prize-money belonging to the captors, and cover it into the Treasury as such, it becomes, to all intents and purposes, prize-money, subject to the permanent appropriation made for the payment thereof to the captors on the decree of court by the statutes now incorporated into Revised Statutes, § 3689, second edition, p. 728, and § 4611. It has then certainly, if not before, lost its identity, as any other money, or as belonging to any other persons; more strongly so when, as in this case, no knowledge or notice comes to them or to the defendants, in any form whatever, that there are other claimants thereto, until a long time after it has been paid out as it was received, under the decree of court and in pursuance of an appropriation made by law.
This money was deposited with the assistant treasurer at Washington, under the first order of court, as prize-money, to “remain in the hands of said assistant treasurer, subject to the further order of this court;” and it may be noted here that the assistant treasurer at Washington never receives on deposit any money other than prize-money deposited under the provisions of law (now Rev. Stats., § 4629); all other public money, or *54 money in control of tlie Federal courts, in Washington, being-deposited with, the Treasurer. Subsequently, the further order of court was to pay it into the Treasury and distribute it according to the decree, which is set forth, and which named the vessels which were to share therein and the amounts to each, and the statute (Rev. Stats., § 4641) provided how that should be done, and it was done accordingly. The money was thus received with a condition annexed thereto; it could have been received in no other way; and if the defendants’ officers so received it they were bound so to distribute it, and their acts in pursuance thereof are binding on all parties concerned.
The chief justice of the Supreme Court of the District of Columbia, holding a district court, seems to have decreed a distribution of the money as by consent of the only party having control of the same. He appears to have proceeded upon the ground that the court, having general jurisdiction of all cases of prize and forfeiture, might by common consent waive the forms required in adverse proceedings when Admiral Porter was willing to dedicate as prize-money, for the benefit of the officers and men of his squadron, money which he had on deposit in his own name, and no doubt then believed by all parties to be his own property, rightly and legally acquired; and this, too, without conflicting with that general principle of law that courts cannot acquire jurisdiction by consent of parties. Whether or not that view was correct is immaterial in this case.
Conceding that the proceedings in the district court of the District of Columbia, by recitals therein contained, carried with them notice to the Treasury officials that the decree was extrajudicial, and that the money was erroneously held and decreed to be prize-money, still there ivas nothing- therein to give them notice that it -was the proceeds of captured and abandoned property, since the Act of March 12, IS63, in terms, provided for the payment into the Treasury of such money only through Treasury agents, and did not put those officials on their guard to look for it in the decrees of prize courts. On the contrary, the notice to them was no more than that Admiral Porter, in his generosity and magnanimity, voluntarily contributed to the fund deposited for the benefit of captors his own money, duly and legally awarded to him as informer. But whatever the notice was or might have been, if the Treasury officers had lookedinto the proceedings thoroughly, I am not prejiared to hold that the *55 United States are chargeable with such notice so laid before public officers whose duties are prescribed and limited by law, and in the absence of any statute provision on the subject of notice applicable to such a case.
It is true that now, in this court, by means of witnesses and the efforts of the Attorney-General’s Office, the money is traced through the various changes to which it was subjected into and out of the public Treasury, and no doubt with more witnesses, and more litigation it might be further traced even beyond the hands of the hundreds of officers and men of the Navy to whom it was distributed. But when.received and paid out by the Treasury officials no witnesses were or could have been called and sworn, no adverse claimants or counsel appeared to press their views, and the money had no ear-marks penetrating through the several vails which obscured its origin. It was then, and not afterwards, by the dim light of that day, and not by the noonday sun of this, that the rights and liabilities of the parties became fixed.
It is a matter of familiar history that large amounts of money were paid in and out of the Treasury as prize-money to captors ■and as shares to informers upon the decrees of Federal courts, and if the defendants are to be held liable for all the errors of those courts in the proceedings upon which the decrees were founded, and made to pay over again money which they have paid out upon the same decree as that bj^ which they received it, without notice of any adverse claim thereto, simply because the owners of captured and abandoned property are able to trace into the mass of money so received and^paid out the proceeds of their property, a liability will be established which, it seems to me, was not contemplated by Congress in passing the Captured or Abandoned Property Act, is not within the reasonable construction, as it certainly is not within the language, of that act, and which would be fraught with peril to the due administration of the Treasury Department.
The Captured or Abandoned Property Act was an act of grace and favor, passed in sympathy for the loyal people in rebellious States, Avho, being inhabitants of rebel territory, were in law rebel enemies. The Government might have confiscated all their property, or, by the more rigorous rules of warfare, might have seized and held it all as booty. Congress relaxed the harsher laws, and undertook to make the Government a trustee *56 for the residue of tbe proceeds of tbeir property, captured or abandoned, which reached the Treasury in the maimer provided by that act to which they could establish their right. This threw upon the claimants all losses by the accidents to which the property and the proceedings might be subject, and gave to them only the right to recover such moneyas the United States might actually receive and hold as trustees. The records of this court furnish abundant evidence that large quantities of property captured and seized by officers of the United States were so disposed of that the money never reached the Treasury, and yet the defendants are not held liable therefor. (Ross v. The United States, 92 U. S., 281.) And I am unable to see how they can be held liable when, as in this case, the loss occurred through the decree of the district court in Illinois, talcing part of the proceeds, turning it into another channel, where it lost its identity and came into the Treasury under another name, was credited to another fund, and was paid out as received, without notice of any other claim thereto.
A case under the Captured or Abandoned Property Act is very much like an action of assumpsit for money had and received,, in which, when maintainable, the defendant is frequently said by the courts to be trustee of the money for the plaintiff, precisely as the Supreme Court has often called the United States trustees of the proceeds of captured and abandoned property for the loyal owners. And we are sure that no adjudicated case can be found in which it has been held that such an action could be maintained against one who, having received money on deposit from another as his own property, has paid it out as he received it, to the same party, or on his order, without notice of any adverse claimant thereto, simply upon proof that the depositor wrongfully obtained the same from the plaintiff.
In Town of Verona, v. Peckham et al. (66 Barb., 103) it is laid down, in language quite applicable to the present case, that although money may have passed into the hands of an individual in a Avay not authorized by law, yet if it is given him to be applied to a specific purpose, and he has so applied it, he cannot in equity and good conscience be called upon to refund it.
I may add, as to the amendment of the district attorney to the libel in the district court of Illinois striking out the first allegation therein, my opinion is that he intended, and the effect of the amendment was, to strike out what may be called *57 tbe first count therein, tbe allegation that “tbe said cotton was purchased in a district, or part of a district, or part of tbe Dnited States wbicb before said purchase bad been declared to be under insurrectionary control by tbe President of tbe Dnited States, and was proceeding from said district or part of tbe Dnited States to another district or part of tbe Dnited States'which bad not been so declared to be under insurrec-tionary control, contrary to tbe Act of July 13,1861, and tbe proclamation of tbe President of August 16, 1861,” leaving tbe libel to stand and tbe judgment to be founded on tbe second count; tbe allegation added at tbe time of filing tbe bbel, that “tbe said property belongs to a person now in armed rebellion against tbe Government of tbe Dnited States,” under tbe Act of July 17,1862 (12 Stat. L., 590). It is with this view that I concur with my associates in bolding that tbe claimant is entitled to judgment for $12,680.20.